# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-60302

United States Court of Appeals
Fifth Circuit

**FILED**

March 3, 2020

Lyle W. Cayce
Clerk

CONSUMER FINANCIAL PROTECTION BUREAU,

      Plaintiff - Appellee

v.

ALL AMERICAN CHECK CASHING, INCORPORATED; MID-STATE
FINANCE, INCORPORATED; MICHAEL E. GRAY, Individually,

      Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

In *Collins v. Mnuchin*, our court was explicit that its holding on the constitutionality of the FHFA's structure was not inconsistent with the D.C. Circuit's holding in *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018). *See Collins*, 896 F.3d 640, 672–74 (5th Cir. 2018); *Collins*, 938 F.3d 553, 588 (5th Cir. 2019) (en banc) (reinstating the relevant portion of the *Collins* panel majority decision). Persuaded by the thoughtful and reasoned analysis of that circuit and the Ninth Circuit, which addressed the same question in *CFPB v. Seila Law LLC*, 923 F.3d 680 (9th Cir. 2019), *cert. granted*, 140 S. Ct. 427

No. 18-60302

(2019), I conclude that the restrictions on the President's removal authority under the Consumer Financial Protection Act are valid and constitutional.

The issue is both fundamental and contestable, and it is not an issue that has been clearly answered by existing Fifth Circuit precedent, though I am persuaded that our existing precedent does not compel a contrary conclusion. *See Collins*, 896 F.3d at 673 (highlighting the "salient distinctions" between the CFPB and the FHFA that make the court's reasoning in *Collins* consistent with the reasoning in *PHH*). Therefore, I look forward to its likely resolution by the Supreme Court. As my colleagues are aware, my own preference in this specific, post-*Collins* case would have been to hold our matter several months in abeyance.[1] That preference was unpersuasive for reasons I respect and, indeed, I now am confident that views they may choose to elaborate will offer new insights to the Supreme Court.

Three circuits have now weighed in on this important question, and the Supreme Court will benefit from those perspectives, as well as the comprehensive and well-reasoned brief of court-appointed amicus curiae. Given the many eloquent voices that have spoken on this question—in majority, concurring, and dissenting opinions—I see little reason to "re-plow the same ground here," *Seila Law*, 923 F.3d at 682.

Thus, finding that neither the text of the Constitution nor the Supreme Court's previous decisions support the Appellants' arguments that the CFPB is unconstitutionally structured, the district court is AFFIRMED.

---

[1] As I emphasize in my opening sentence, the constitutionality of the CFPB's removal provision was left open by the *Collins* majority, notwithstanding the contrary viewpoint expressed by my dissenting colleague. I would also add that there would have been no need for this panel's intercession had the court chosen to place this case in abeyance until the Supreme Court decides the identical issue that it heard today.

No. 18-60302

PATRICK E. HIGGINBOTHAM, Circuit Judge, joined by STEPHEN A. HIGGINSON, Circuit Judge, concurring:

In the wake of the 2008 financial crisis, a special commission formed by Congress found that "failures in financial regulation and supervision" had "proved devastating to the stability of the nation's financial markets."[1] The consumer-protection system, with its "seven different federal regulators," was "too fragmented to be effective."[2] Congress concluded that in the run-up to the recession these regulators "had failed to prevent mounting risks to the economy, in part because [they] were overly responsive to the industry they purported to police."[3]

Congress responded. It created the Consumer Financial Protection Bureau ("CFPB" or the "Bureau"), "a new, streamlined independent consumer entity housed within the Federal Reserve System."[4] In placing the federal consumer-financial protection apparatus under the roof of a single agency with civil enforcement power, Congress sought increased accountability, consistency, and escape from regulatory capture, ultimately ensuring "that markets for consumer financial products and services are fair, transparent, and competitive."[5]

To that end, the Consumer Financial Protection Act ("CFPA") created the Bureau and tasked the new entity with "implement[ing] and, where applicable, enforc[ing]" eighteen preexisting consumer-protection statutes.[6] It also charged the Bureau with taking enforcement actions against "unfair,

---

[1] NAT'L COMM'N ON THE CAUSES OF THE FIN. & ECON. CRISIS IN THE U.S., FINANCIAL CRISIS INQUIRY REPORT, at xviii (2011).

[2] S. REP. NO. 111-176, at 10 (2010).

[3] *PHH Corp. v. CFPB*, 881 F.3d 75, 77 (D.C. Cir. 2018) (en banc).

[4] S. REP. NO. 111-176, at 11.

[5] 12 U.S.C. § 5511(a).

[6] *Id*; *see also id.* § 5481(12). The CFPA is Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

No. 18-60302

deceptive, or abusive" practices related to consumer financial products and services, such as retail banking, payday lending, and financial data processing, to name a few.[7] As needed, the Bureau may promulgate rules, issue orders and guidance, and supervise banks, payday lenders, and other covered entities.[8] The Bureau also has tools for conducting investigations and administrative discovery, including the power to issue subpoenas and civil investigative demands.[9] And it may hold hearings and conduct adjudications, as well as bring civil enforcement actions in court through its own attorneys and in its own name.[10]

Drawing on familiar features of agency design, Congress centralized control of the new agency by handing the reins to a single CFPB director appointed for a five-year term by the President with the advice and consent of the Senate and removable by the President for "inefficiency, neglect of duty, or malfeasance in office."[11] Like other financial regulators, the CFPB's funding does not flow from annual congressional appropriations.[12] Instead, the director requests from the Federal Reserve Board of Governors "the amount determined . . . to be reasonably necessary to carry out the authorities of the Bureau" each year,[13] capped by statute at twelve percent of the Federal Reserve System's budget.[14]

While consolidating the dispersed enforcement regime with its vulnerability to agency capture, Congress remained attentive to the nigh

---

[7] 12 U.S.C. § 5531.

[8] *See id.* §§ 5512(b), 5514–16.

[9] *See id.* § 5562 (a)–(c).

[10] *See id.* §§ 5563, 5564(a)–(b).

[11] *Id.* § 5491(b), (c)(3).

[12] *See, e.g., id.* § 16 (Comptroller of the Currency); *id.* § 243 (Federal Reserve Board); *id.* §§ 1815(d), 1820(e) (Federal Deposit Insurance Corporation).

[13] *Id.* § 5497(a)(1).

[14] *Id.* § 5497(a)(2)(A)(iii).

No. 18-60302

axiom that financial regulators work most effectively with a measure of independence attending the accountability of executive oversight.[15] The result was a CFPB overseen by the Financial Stability Oversight Council ("FSOC"), which has veto power over any rule it concludes will "put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk."[16] The President appoints a majority of the FSOC's members, all experts in banking, finance, or insurance.[17] "Thus, if the Director's decisionmaking goes awry on a critical rulemaking, a multi-member body of experts can step in" to correct it.[18] In sum, the line of authority runs directly to the President.

## I.

In 2016, the CFPB filed this civil enforcement action against two Mississippi-based check-cashing and payday-lending entities and their owner, Michael Gray (collectively, the "Payday Lenders") in the Southern District of Mississippi.

The complaint alleged that the Payday Lenders had engaged in "unfair, deceptive, or abusive act[s] or practice[s]"[19] by, among other things, "refusing to disclose [their] check cashing fee," unlawfully "retain[ing] overpayments made by consumers," and "misrepresent[ing] the amount and number of fees associated" with their lending services. From 2011 to 2017, the Payday

---

[15] *See generally* HENRY B. HOGUE ET AL., CONG. RESEARCH SERV., R43391, INDEPENDENCE OF FEDERAL FINANCIAL REGULATORS: STRUCTURE, FUNDING, AND OTHER ISSUES (2017).

[16] 12 U.S.C. § 5513(a).

[17] *Id.* § 5321(b). Of the FSOC's ten members, the President "has the opportunity to appoint either at the outset or near the beginning of the administration" six of them: the Secretary of the Treasury and the chairpersons of five independent agencies. *PHH*, 881 F.3d at 120 n.3 (Wilkins, J., concurring). The remaining four members of the Council serve terms longer than four years and so will not necessarily be appointed by a one-term president. *Id.*

[18] *PHH*, 881 F.3d at 120 (Wilkins, J., concurring).

[19] 12 U.S.C. § 5531(a); *see id.* § 5536(a)(1)(B).

No. 18-60302

Lenders "charged more than 46,000 consumers more than $5.4 million in [unauthorized] check-cashing fees"—just one of the ways they allegedly fleeced consumers. Over this period, Gray, their owner, assertedly paid himself "more than $13.5 million in compensation," plus salaries to his wife, seven-year-old son, and six-month-old daughter.

The Payday Lenders responded that the CFPB is unconstitutionally structured and that any enforcement action it initiates is void from its inception.[20] Looking to the D.C. Circuit's then-recent en banc opinion in *PHH Corporation v. CFPB*,[21] the district court denied the Payday Lenders' motion to dismiss, holding that "the Bureau is not unconstitutional based on its single-director structure." The district court then certified its order for interlocutory appeal, observing that this case presents "substantial ground for difference of opinion."[22]

Meanwhile, a petition for en banc review was granted in *Collins v. Mnuchin*, which presented a constitutional challenge to the Federal Housing Finance Agency ("FHFA"), the federal regulator of two government-sponsored entities ("GSEs").[23] The en banc Court declined to consolidate the two cases. This panel then heard oral argument but withheld decision pending the en banc Court's resolution of *Collins*. *Collins* ultimately held that the FHFA's "unique constellation of insulating features offends the Constitution's separation of powers."[24] In essence, the en banc Court determined that the FHFA is too insulated from executive control because it is funded through

---

[20] The Payday Lenders raised other defenses, but only its claim of unconstitutional structure is before the Court on appeal.

[21] *See* 881 F.3d 75, 78 (D.C. Cir. 2018).

[22] *See* 28 U.S.C. § 1292(b).

[23] *Collins v. Mnuchin*, 896 F.3d 640 (5th Cir. 2018).

[24] *Id.* at 670; *see Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019) (en banc).

annual assessments on the GSEs, is free of any formal executive control, and is led by a single director removable only for cause.[25]

The *Collins* Court distinguished *PHH*, where the D.C. Circuit rejected similar attacks on the CFPB's constitutionality.[26] *Collins* emphasized the differing structures of the FHFA and CFPB, noting that while the Executive Branch has no authority over the FHFA, it "can directly control the CFPB's actions through the FSOC."[27] In its words, this distinction between the two agencies "compel[led] a contrary conclusion."[28] It follows that *Collins*'s analysis of the FHFA is not offended by the panel's analysis of the defenses to the Bureau's suit proffered here.

On the filing of *Collins*, we directed the parties to respond to its effect and held a second round of oral argument. The CFPB then notified the Court of an about-face in its litigation position. The CFPB Director had defended the constitutionality of the agency's structure, but advised that she now "agrees with the Department of Justice that the CFPA's for-cause removal provision impermissibly infringes on the President's constitutional obligation to take care that the laws be faithfully executed."[29]

## II.

The Payday Lenders argue that the structure of the CFPB denies the Executive Branch its due because the Bureau is led by a single director removable by the President only for cause. We find no support for this

---

[25] *Collins*, 896 F.3d at 674 (panel); *Collins*, 938 F.3d at 588 (en banc) (reinstating the opinion of the *Collins* panel with respect to the constitutionality of FHFA's structure).

[26] *Collins*, 896 F.3d at 670–74 (panel); *see Collins*, 938 F.3d at 588 (en banc) (distinguishing *PHH*).

[27] *Collins*, 896 F.3d at 673 (panel).

[28] *Id.*

[29] On October 18, 2019, the Supreme Court granted certiorari to hear an appeal of the Ninth Circuit's decision in *CFPB v. Seila Law LLC*, which upheld the CFPB's constitutionality on grounds similar to the D.C. Circuit's in *PHH*. *Seila Law*, 923 F.3d 680 (9th Cir.), *cert. granted,* 140 S. Ct. 427 (2019).

argument in constitutional text or in Supreme Court decisions and uphold the constitutionality of the CFPB's structure, as did the D.C. and Ninth circuits.

The Constitution grants Congress the authority to establish and structure executive-branch offices, agencies, and departments. The Appointments Clause, with its complementing Necessary and Proper Clause, establishes Congress's role as chief architect of the Executive Branch:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . *all other Officers* of the United States, whose Appointments are not herein otherwise provided for, and which shall be *established by Law*: but the Congress may *by Law* vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.[30]

All officers, whether principal or inferior, are established "by Law"—an Act of Congress, not presidential order.[31] The President may appoint officers, but beyond his veto power he has no special role in the creation of their offices. This is because the Necessary and Proper Clause sweeps the authority to establish offices into Article I, providing Congress not only the power to make all laws "necessary and proper for carrying into Execution" its enumerated powers but also "all other Powers vested by this Constitution in the Government of the United States, or *in any Department or Officer thereof*."[32]

These clauses allocate the power to assemble the structures of our government—Congress may both create an agency and define its authorities, responsibilities, leadership structure, and chain of command. As James Madison explained it to the First Congress in New York: "The Legislature creates the office, defines the powers, limits its duration, and annexes a

---

[30] U.S. CONST. Art. 2, § 2, cl. 2 (emphases added).

[31] This excludes those offices specifically provided for in the Constitution.

[32] U.S. CONST. Art. 1, § 8, cl. 18 (emphasis added).

compensation."[33] That is, the Constitution gave Congress the task of building the Executive Branch, explaining the want of attention by the First Congress to the President's role in establishing offices before creating the first executive departments and their corresponding principal and inferior offices.[34]

And so it is unsurprising that Congress's authority to organize the Executive Branch presents as well established in contrast to the less certain foundations of a President's authority to remove officers. Impeachment aside, the President's power of removal was little discussed at the Constitutional Convention and is not addressed in the Constitution.[35] And the Framers held disparate views on where the power of removal ought reside. Alexander Hamilton argued that the "consent of [the Senate] would be necessary to displace as well as to appoint" officers.[36] But Madison then argued in the First Congress that there was no limit on the President's constitutional authority to remove the Secretary of Foreign Affairs, while intimating that Congress may limit the scope of the President's removal power over certain officers.[37] The Supreme Court has since found the President's removal power to be implicit in the Executive Vesting Clause and the Take Care Clause: "Article II vests '[t]he executive Power . . . in a President of the United States of America,' who must 'take Care that the Laws be faithfully executed.'"[38] Thus, Congress cannot so

---

[33] *See* 1 ANNALS OF CONG. 581 (1789).

[34] DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD 1789-1801, at 36 n.205 (1997).

[35] *Myers v. United States*, 272 U.S. 52, 109–10 (1926).

[36] THE FEDERALIST NO. 77.

[37] 1 ANNALS OF CONG. 611–12 (1789) (stating that an official who "partakes strongly of the judicial character . . . should not hold . . . office at the pleasure of the Executive branch of the Government").

[38] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting U.S. CONST. Art. II, § 1, cl. 1; and *id.* § 3).

No. 18-60302

constrain the President's removal authority as to deprive him of the ability to perform his "constitutionally assigned duties."[39]

Against Congress's sweeping textually footed power to organize agencies and the President's judicially implied, necessary authority to remove officers, the Supreme Court has, without exception, upheld for-cause protection for officers so long as removal authority remains in the hands of the President or his at-will agents.[40] In *Humphrey's Executor v. United States*, the Court upheld for-cause protection for Federal Trade Commissioners.[41] In *Wiener v. United States*, it upheld for-cause protection for the War Claims Commissioners, who were responsible for adjudicating claims arising out of World War II.[42] Significantly, the *Wiener* Court recognized removal protection for the Commissioners though the statute was silent on such limits. Similarly, in *Free Enterprise Fund v. PCAOB*, the Court inferred for-cause protection for SEC commissioners.[43] The Court also upheld for-cause removal protection for the independent counsel in *Morrison v. Olson*, even though Congress had given the removal authority to the President's at-will agent, the Attorney General.[44]

Although the Supreme Court has never invalidated a for-cause stricture on the President's removal power, it has struck down officer removal restrictions three times—each where the removal power has been held by Congress or given to someone other than the President. In *Myers v. United States*, the Court held Congress could not condition the President's decision to

---

[39] *Morrison v. Olson*, 487 U.S. 654, 696 (1988).

[40] These cases were described at greater length in *PHH,* 881 F.3d at 96. Like the Ninth Circuit, "[w]e see no need to re-plow the same ground here." *Seila Law*, 923 F.3d at 682.

[41] 295 U.S. 602 (1935).

[42] 357 U.S. 349 (1958).

[43] 561 U.S. at 487 (internal citations omitted) (quoting *Humphrey's Ex'r,* 295 U.S. at 620) ("The parties agree that the Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office,' and we decide the case with that understanding.").

[44] 487 U.S. 654 (1988).

remove an officer on the advice and consent of the Senate.[45] Likewise, in *Bowsher v. Synar*, the Court concluded that Congress could not retain the authority to remove an executive officer.[46] Most recently, in *Free Enterprise Fund v. PCAOB*, the Court returned to the issue of removal power where members of the Public Company Accounting Oversight Board ("PCAOB") could be removed only for cause and only by SEC Commissioners, not the President.[47] The Court held that Congress withdrew "from the President any decision on whether that good cause exists. That decision [was] vested instead in other tenured officers—the Commissioners—none of whom [was] subject to the President's direct control."[48] The Court invalidated the PCAOB's for-cause protection but left intact the SEC's for-cause protection. In so doing, the Court effectively returned the power of removal to the President's hand.[49]

The structure of the CFPB is well within the constitutional lines drawn by the Supreme Court. In the CFPA, Congress gave itself no removal authority. It only imposed a constraint on removal that the Supreme Court has twice read into otherwise silent statutes.[50] And Congress left the decision to remove the CFPB Director to the President alone: Neither Congress nor any subordinate officer plays a role in the President's exercise of his removal authority. This forecloses the challenge to the constitutionality of the CFPB.

---

[45] 272 U.S. 52 (1926).

[46] 478 U.S. 714 (1986).

[47] 561 U.S. 477 (2010).

[48] *Id.* at 495.

[49] *Id.* at 509 ("The Commission is then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight.").

[50] *Id.* at 487; *Wiener*, 357 U.S. at 349–50; *see also Collins*, 896 F.3d at 667 ("[L]imiting the President to 'for cause' removal is not sufficient to trigger a separation-of-powers violation.").

No. 18-60302

Our conclusion is nigh controlled by *Humphrey's Executor*.[51] There, the Court upheld for-cause protection for FTC Commissioners, who were empowered to prohibit the use of "unfair methods of competition in commerce."[52] This protection afforded them a measure of independence vital to their "predominantly quasi judicial and quasi legislative" roles.[53] Thus, the FTC and CFPB are constitutional siblings in all constitutionally relevant respects: They are both consumer-protection financial regulators with quasi-legislative, quasi-judicial, and some executive powers, whose leaders enjoy identical and limited for-cause protection.

Our issue is not the "power" of the agency in the abstract but the allocation of its superintendence. Still, the Payday Lenders argue that *Humphrey's Executor* is inapposite because the CFPB is uniquely powerful. To be sure, the CFPB has significant civil enforcement authority that the FTC lacked when *Humphrey's Executor* was decided in 1935.[54] But as *Morrison* recognized, the FTC's restriction on for-cause removal remains constitutional even though the FTC, like the CFPB, can now bring civil actions.[55] More importantly, *Morrison* upheld the for-cause removal restriction for the independent counsel even though she was authorized to investigate and prosecute crimes, a quintessential executive power.[56] And in *Free Enterprise Fund*, the Supreme Court left in place the SEC's for-cause removal restriction

---

[51] *See Seila Law*, 923 F.3d at 684 ("In short, we view *Humphrey's Executor* and *Morrison* as controlling here.").

[52] *Humphrey's Ex'r*, 295 U.S. at 620 (quoting 15 U.S.C. § 45(a)(2)).

[53] *Id.* at 629. As the Supreme Court recognized in *Morrison*, "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." 487 U.S. at 690 n. 28.

[54] *See* Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 205(a), 88 Stat. 2183, 2200–01 (1975) (codified as amended at 15 U.S.C. § 45(m)(1)(A)) (authorizing the FTC to "commence a civil action to recover a civil penalty in a district court of the United States").

[55] *Morrison*, 487 U.S. at 692 n.31.

[56] *Id.* at 691.

12

No. 18-60302

even though the SEC, a financial regulator like the CFPB, wields broad enforcement, rulemaking, and adjudicatory powers.[57]

The Payday Lenders point out that the CFPB, unlike the FTC, is led by a single director, not multiple commissioners, but this offered distinction is without support in Supreme Court precedent. As both *PHH* and *Seila Law* recognized, *Humphrey's Executor* and *Wiener* attached no significance to the fact that the agencies were led by multiple members.[58] Further, "[t]he fact that the independent counsel [in *Morrison*] was a solo actor played no role in either the Court's decision for an eight-member majority or Justice Scalia's dissent[.]"[59] Nor in *Bowsher* was it of any consequence that the General Accounting Office was led by the Comptroller General alone and not a board of commissioners.[60] What mattered was that Congress had appropriated to itself the President's authority to remove an executive officer.

## III.

Our decision in *Collins* provides no assistance to the Payday Lenders.[61] There, we found that the FHFA's single-member leadership, in conjunction with for-cause removal protection and other features, unconstitutionally insulated the FHFA.[62] We reached this conclusion only after conducting a "fact-specific inquiry," one that made plain the reality that the FHFA is "sui

---

[57] *Free Enter. Fund*, 561 U.S. at 514.

[58] *Seila Law*, 923 F.3d at 684; *PHH*, 881 F.3d at 98–99.

[59] *PHH*, 881 F.3d at 96; *see also id.* at 96 n.2 (concluding that the distinction between inferior and principal officers is irrelevant in removal cases because they are concerned not with whether the officer exercises governmental authority, but with whether the officer's independence interferes with the President's constitutional obligation to ensure the faithful execution of the laws).

[60] 478 U.S. at 731–32.

[61] *See Collins*, 896 F.3d at 675 n. 274 ("We leave for another day the question of whether other agencies suffer from similar constitutional infirmities. And, of course, our opinion does not abrogate the *Morrison* Court's holding regarding the constitutionality of an independent agency tasked with investigating high-ranking Executive Branch officials.").

[62] *Id.* at 659–75.

generis."[63] It is not "similarly situated" to the FTC in *Humphrey's Executor*, the independent counsel in *Morrison*, or the CFPB in *PHH*.[64] Then—and here it distinguishes the CFPB as well—we reasoned that whereas the FSOC's veto provides the Executive Branch with "an emergency brake to hold the CFPB accountable," the Executive Branch holds no formal control over the FHFA.[65]

Here, the single-leader structure mitigates the constitutional concerns underlying for-cause removal protection.[66] Before the 2008 financial crisis, seven different agencies—"virtually all of which were also independent"[67]—shared responsibility for consumer financial protection.[68] The diffusion of responsibility looked past regulatory arbitrage and undercut accountability.[69] A President determined to change the administration of consumer financial protection would have faced a bureaucratic maze—multiple multi-member agencies with disparate authorities spread across eighteen statutes.[70] As the Supreme Court recognized in *Free Enterprise Fund*, "[t]he diffusion of power carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought

---

[63] *Id.* at 666 n. 196, 670.

[64] *Id.* (formatting modified).

[65] *Id.* at 670, 673–74.

[66] *Cf.* Brief of Rachel E. Barkow, Kirti Datla, Richard L. Revesz, and Robert B. Thompson as Amici Curiae, p.3, *CFPB v. Seila Law*, No. 19-7, (*petition for cert. granted*, Oct. 18, 2019) ("[T]he neat distinction between single-member agencies and multi-member agencies . . . rests on inaccurate descriptions of how multi-member agencies are structured, and how they function.").

[67] *PHH*, 881 F.3d at 81.

[68] S. REP. NO. 111-176, at 11 (2010) ("The legislation ends the fragmentation of the current system by combining the authority of the seven federal agencies involved in consumer financial protection in the CFPB, thereby ensuring accountability.").

[69] *Id.* ("The CFPB will stop regulatory arbitrage."); *id.* at 229 ("The CFPB would stop regulatory arbitrage—it will write rules and enforce those rules consistently[.]").

[70] 12 U.S.C. §§ 5481(12), 5581(a)(2), (b) (transferring these statutory authorities to the CFPB).

really to fall.'"[71]

Congress replaced this unmanageable bureaucracy with the CFPB, a single agency led by a single director. The CFPB's single-leader structure places responsibility, public scrutiny, and political pressure on the shoulders of one individual, preventing the risk of buck-passing that may undermine the accountability of some multi-member commissions.[72] And it allows the President to exercise tighter control over the CFPB, as the President need only remove the Director, not several commissioners, to change its direction. His appointees are positioned with firm control.

*Free Enterprise Fund* also eschewed the focus on miscellaneous elements of agency design that the Payday Lenders urge here. The Court rejected the dissent's argument that agency independence often turns less on for-cause removal than on a host of legislative decisions about the agency structure.[73] It dismissed these considerations as "bureaucratic minutiae" that downplay the "importance of the removal as a tool of supervision."[74] Indeed, the Payday Lenders identify no case in which a Supreme Court decision turned on such factors. While they cling to *Free Enterprise Fund*, it offers no receiving hand. The constitutional problem was not bureaucratic minutiae but the presence of layered removal clauses, which gave the power of removal to another, together

---

[71] 561 U.S. at 497–98 (quoting THE FEDERALIST NO. 72 (Alexander Hamilton)).

[72] *See* Ganesh Sitaraman & Ariel Dobkin, *The Choice Between Single Director Agencies and Multimember Commissions*, 71 ADMIN. L. REV. 719 (2019). Ultimately, it is for Congress to resolve the quasi-empirical claims about the effects of different agency designs. Judges are not natural architects of bureaucracies, as we cannot make the fine-grained trade-offs inherent in the design of agencies.

[73] *See Free Enter. Fund*, 561 U.S. at 524 (Breyer, J., dissenting) ("[A] legislative decision to place ultimate administrative authority in, say, the Secretary of Agriculture rather than the President, the way in which the statute defines the scope of the power the relevant administrator can exercise, the decision as to who controls the agency's budget requests and funding, the relationships between one agency or department and another, as well as more purely political factors (including Congress' ability to assert influence) are more likely to affect the President's power to get something done.").

[74] *Id.* at 500; *see also PHH*, 881 F.3d at 126–27 (Griffith, J., concurring in judgment).

No. 18-60302

effectively cutting the President's line of authority to remove the members of the PCAOB.

**IV.**

Even if the CFPB's constitutionality be doubted, constitutional avoidance would counsel footing our decision on statutory grounds: "It is the duty of federal courts to construe a statute in order to save it from constitutional infirmities[.]"[75] We may read the standard to impose only a lesser limit on the President's power to remove. One such reading appears in *PHH*, which concluded that "inefficiency" should be read to permit removal on the basis of policy disagreement alone;[76] that *Bowsher*, where Congress claimed for itself the power to remove an officer for inefficiency, neglect, or malfeasance,[77] determined that the removal standard was "very broad" and "could sustain removal of a Comptroller General for any number of actual or perceived *transgressions of the legislative will*."[78] And looking to dictionary definitions from the time the "inefficiency, neglect of duty, or malfeasance" standard was first adopted, as well as the present day, "inefficiency" in particular bears a capacious definition capable of encompassing policy disagreement.[79] This is "a construction of the statute" that is "fairly possible."[80] It follows that even if this were not the only fair construction of the standard, its breadth welcomes constitutional avoidance, an anodyne of patience to await a decision that may be necessary, if at all, at a later time when events may have brought light to the issue or see them fall into a bin of lost currency.

---

[75] *Morrison*, 487 U.S. at 682

[76] *See generally PHH*, 881 F.3d at 125–37 (Griffith, J., concurring in judgment).

[77] *Id.* at 129.

[78] *Id.* (quoting *Bowsher*, 478 U.S. at 729).

[79] *Id.* at 131–34.

[80] *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

No. 18-60302

## V.

The President can remove the CFPB Director only for "inefficiency, neglect of duty, or malfeasance in office," a broad standard repeatedly approved by the Supreme Court. That alone is enough to decide this case. If there is any threat of undue concentration of power, the Office of President is its beneficiary.

No. 18-60302

JERRY E. SMITH, Circuit Judge, dissenting:

We are not the first court to address a constitutional challenge to the CFPB, nor will we be the last.[1]  When the District of Columbia Circuit took a spin, then-Judge Kavanaugh urged that the issue ultimately turns on one concept: power.[2]  Right he was.  This case presents a fundamental question about governmental authority:  May Congress vest enormous executive power in one person who does not answer to the President or, indeed, to anyone else?  More on that to come.

But Justice Kavanaugh was right in a way that not even he could have foreseen.  Here at the Fifth Circuit, the latest test of the CFPB's legitimacy has deteriorated into a regrettable commentary on another form of power: the asserted prerogative of two judges to abandon en banc precedent they dislike.

In *Collins v. Mnuchin*,[3] the en banc court confronted a challenge to the Federal Housing Finance Agency ("FHFA")—an entity that, in all relevant respects, is indistinguishable from the CFPB.  We concluded, by a strong 12–4 margin, that the FHFA's structure was unconstitutional.  Yet today, the majority holds the very opposite for the CFPB, basing its naked disagreement with the en banc court on the flimsiest of grounds.  Indeed, one judge in the majority dissented in *Collins* but now enacts his disagreement into law.  The other judge did not participate in *Collins*, but even a skim of his "paean to the administrative state"[4] reveals that he too would have dissented.

---

[1] *See CFPB v. Seila Law LLC*, 923 F.3d 680 (9th Cir.), *cert. granted*, 140 S. Ct. 427 (2019) (argued Mar. 3, 2020).

[2] *See PHH Corp. v. CFPB*, 881 F.3d 75, 166 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

[3] 938 F.3d 553 (5th Cir. 2019) (en banc), *petition for cert. filed* (U.S. Sept. 25, 2019) (No. 19-422).

[4] *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010).

No. 18-60302

*Collins* winds up in the dustbin because two judges say it should. At one time, those judges thought it beyond the pale "to rely on strength in numbers rather than sound legal principles in order to reach their desired result in [a] specific case."[5] Now, they suddenly discover that *stare decisis* is for suckers.[6]

This case is absolutely about power. The majority declares open season on the en banc court. With great respect for my two dedicated colleagues, who would not purposefully undermine the rule of law, I dissent.

## I. THE CFPB

Congress turned to a familiar tool in response to the 2008 financial crisis—a new independent bureau. Enter the CFPB. Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act[7] established the Bureau and housed it within the Federal Reserve System (the "Fed"). Congress exhorted the CFPB to "regulate the offering and provision of consumer financial products or services under" federal law and "ensur[e] that all consumers have access to" "fair, transparent, and competitive" markets for those products. 12 U.S.C. §§ 5491(a), 5511(a). To carry out its roving commission, Congress gave the Bureau a lot of muscle. It exercises some form of all three govern-

---

[5] *June Med. Servs., L.L.C. v. Gee*, 913 F.3d 573, 574 (5th Cir.) (Dennis, J., joined by Higginbotham, Graves, and Higginson, JJ., dissenting from the denial of rehearing en banc), *cert. granted*, 140 S. Ct. 35, *and cert. granted*, 140 S. Ct. 35 (2019) (argued Mar. 4, 2020).

[6] Yet my colleagues are well aware of this court's steady invocation of *stare decisis* that we call the rule of orderliness, which prohibits three-judge panels from sidestepping the rulings of previous panels and, more importantly, en banc decisions. *See, e.g., Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015) (Higginbotham, J.) ("Under our circuit's rule of orderliness, these decisions, involving the application of essentially the same facts to the same law, control our own, and require us to deny the [requested] relief."); *United States v. Castillo-Rivera*, 853 F.3d 218, 227 (5th Cir. 2017) (en banc) (Higginbotham, J., concurring) ("To go forward and reduce the jurisprudence of stare decisis to a detailed code confected by case-by-case determination of rules apart from our well-developed principles of stare decisis would serve disorder, not order.").

[7] Pub. L. No. 111-203, 124 Stat. 1376, 1955 (2010).

No. 18-60302

mental functions: executive, legislative, and judicial.[8]

## A. *Powers*

Start with the CFPB's rulemaking authority. It may prohibit any practice it considers "unfair, deceptive, or abusive" "in connection with *any transaction with a consumer*" in the consumer-financial space.[9] The power to proscribe "abusive" practices appears new in the history of consumer-protection law.[10] And it applies in an impressive number of contexts, given that the CFPB's rulemaking ambit includes mortgages, consumer loans, and credit cards, among other products. *See id.* § 5481(12).

The CFPB also can adjudicate disputes arising under the many laws that it "is authorized to enforce" and any rules that the Bureau prescribes. *Id.* § 5563(a)(1), (2). In other words, the CFPB can write the law and then hear disputes under it.[11]

But maybe most significant is the Bureau's power to enforce consumer-

---

[8] Under the infamous legal fiction that justifies the non-delegation doctrine, the CFPB does not explicitly wield legislative power. *But see Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 488 (2001) (Stevens, J., concurring in part and in the judgment) ("[I]t would be both wiser and more faithful to what we have actually done in delegation cases to admit that agency rulemaking authority is legislative power." (quotation marks removed)).

[9] 12 U.S.C. § 5531(b) (emphasis added). The statute, *see id.* § 5531(c), (d), provides further color as to what the Director may permissibly deem "unfair" or "abusive."

[10] *See PHH*, 881 F.3d at 145 (Henderson, J., dissenting) ("The agency also has expansive *new* powers under Title X to investigate, charge, adjudicate and penalize . . . a consumer-connected act or practice the agency defines as unfair, deceptive, or abusive." (quotation marks removed)); Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 GEO. WASH. L. REV. 856, 918 (2013) ("The term 'abusive,' as used in this context, appears to be an entirely novel term with no forerunners in any prior federal or state statute or regulation.").

[11] *Cf. Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting) ("[W]hile Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code.").

No. 18-60302

protection laws. *See id.* § 5481(12). For years, legislators clamored for a body that might centralize and streamline enforcement of federal consumer protection.[12] The CFPB was the answer. Congress transferred to it the right to administer eighteen statutes (in addition to Title X itself) that seven different agencies had previously overseen.[13]

In brandishing its enforcement authorities, the Bureau retains all the accoutrements of executive power. It can bring enforcement actions in federal court and before administrative law judges. *Id.* § 5564. It may issue subpoenas for testimony or documents, enforceable by contempt. *Id.* § 5562(b). It can make civil investigative demands and file petitions for their enforcement in federal court. *Id.* § 5562(e). And it may seek a smorgasbord of penalties, including rescission of contracts, restitution, disgorgement, damages, and even limits on the defendant's activities and functions. *Id.* § 5565(a)(2).

## B. *Structure*

All of that power is bestowed on one lucky person. Meet the Director of the CFPB, whom the President appoints with the Senate's advice and consent. *Id.* § 5491(b)(1)–(2). After her confirmation, the Director is largely insulated from the political branches. But the President still has two avenues for oversight. Most significantly, he retains the power to fire the Director, *id.* § 5491(c)(3)—but that authority exists only in neutered form. The Director's

---

[12] *See, e.g.*, Elizabeth Warren, *Unsafe at Any Rate*, DEMOCRACY (Summer 2007), perma.cc/52X3-892V; *see also* Zywicki, *supra*, at 857–58 ("[T]he system of consumer financial protection needed streamlining and reform even before the onset of the financial crisis. A patchwork of agencies covered different aspects of the financial system and all of them tended to focus on safety and soundness issues rather than consumer protection.").

[13] *See PHH*, 881 F.3d at 80–81; *see also* 12 U.S.C. § 5481(12) (listing eighteen statutes transferred to the CFPB's jurisdiction). The seven agencies were the Federal Reserve, Office of the Comptroller of the Currency, Office of Thrift Supervision, Federal Deposit Insurance Corporation, National Credit Union Administration, Department of Housing and Urban Development, and Federal Trade Commission ("FTC"). 12 U.S.C. § 5581(b).

No. 18-60302

five-year tenure[14] is guaranteed so long as she does not slack into "inefficiency, neglect of duty, or malfeasance in office."[15]  Separately, the Financial Stability Oversight Council ("FSOC" or "Council") affords the President a limited means to review the CFPB's rulemakings.  *See id.* § 5321.

As for Congress, the CFPB's structure similarly permits little room for oversight.  The Bureau is not funded with congressional appropriations; it instead draws from the Fed's coffers.  *See id.* § 5497.  The Director may request the amount she reasonably needs, and, so long as the request doesn't exceed twelve percent of its budget, the Fed can't turn the Director down.  *Id.* § 5497(a)(1), (2)(A)(iii).  If the request exceeds that upper limit, the CFPB must ask Congress for the excess.  *Id.* § 5497(e).

## II.  EVALUATING REMOVAL RESTRICTIONS

The defendants assert that various features of the CFPB's design combine to violate the separation-of-powers doctrine.  They complain that the President must be able to remove the Bureau's single Director at will.  Between the Supreme Court and this tribunal, much has been said about the power of Congress to interfere with the President's authority to remove his subordinates.

### A.  *Removal at the Supreme Court*

The Constitution assigns "[t]he executive Power" to "a President of the United States of America," U.S. CONST. art. II, § 1, cl. 1, and it exhorts the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3.

---

[14] 12 U.S.C. § 5491(c)(1).  The five-year term can extend a bit longer pending confirmation of a new Director.  *See id.* § 5491(c)(2).

[15] *Id.* § 5491(c)(3).  That is standard language for independent agencies.  *See* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 110 (1994).  The same applies to removal of the commissioners of the FTC, for example.  *See* 15 U.S.C. § 41; *see also Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935) (upholding that removal restriction).

No. 18-60302

Those provisions have inspired plenty of debate about the scope of executive authority. But the Supreme Court has made at least two things certain.

The first is that the President retains the power to remove executive officers. *See Free Enter. Fund*, 561 U.S. at 483. That removal power is justified on two related theories: on the one hand, that it inheres in the nature of executive power; and, on the other, that the President must be able to remove subordinates if he is to execute the law.[16]

The second is that the President's removal power has limits. Except when it sits in impeachment, Congress cannot assume for *itself* a role in removal.[17] But it may, "under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." *Id.* The Supreme Court has upheld the constitutionality of powerful, multimembered agencies whose leaders have protection from termination.[18] It also has sustained the power of Congress to grant removal protections to a solo independent counsel of limited authority.[19] It has not, however, present Term excluded,[20] confronted an agency like the CFPB, with both tremendous power and a solitary leader.

The inquiry for analyzing removal constraints is settled. Initially, the

---

[16] *See Free Enter. Fund*, 561 U.S. at 484; Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 YALE L.J. 541, 597–98 (1994).

[17] *See Myers v. United States*, 272 U.S. 52 (1926) (holding unconstitutional a scheme in which Congress required its advice and consent before the President could remove postmasters); *Bowsher v. Synar*, 478 U.S. 714 (1986) (holding unconstitutional Congress's assignation of executive power to the Comptroller General, an officer whom Congress had the power to remove).

[18] *See Humphrey's Ex'r*, 295 U.S. at 629 (FTC); *Wiener v. United States*, 357 U.S. 349 (1958) (War Claims Commission).

[19] *See Morrison v. Olson*, 487 U.S. 654 (1988).

[20] *See Seila Law*, 923 F.3d at 682.

No. 18-60302

Court asked whether the agency exercised quasi-judicial, quasi-legislative, or quasi-executive power. *See Humphrey's Ex'r*, 295 U.S. at 624. But the Court later adopted a more "considered view." *Morrison*, 487 U.S. at 689. In *Morrison*, *id.* at 689–90, the Court turned the spotlight on the degree to which the restrictions intrude on executive authority. Indeed, when Congress tries to limit the President's power to remove an executive official, we ask whether the legislators have "unduly trammel[ed] on executive authority" and "interfere[d] impermissibly with [the President's] constitutional obligation to ensure the faithful execution of the laws." *Id.* at 691, 693. That is, we decide whether Congress has unduly insulated the officer from the President's oversight.[21]

## B. Collins v. Mnuchin *(en banc)*

The CFPB's single-Director, removal-protected structure is rare in American history.[22] But it is not unfamiliar to this circuit's en banc court. Just last year, in *Collins v. Mnuchin*,[23] we ruled on a constitutional challenge to the FHFA, an agency whose structure is a near-perfect image. *Collins* is hot off the press but apparently deserves to be ignored.

### 1.

On to *Collins*. Congress charged the FHFA with overseeing two impor-

---

[21] *See Free Enter. Fund*, 561 U.S. at 501 (analyzing a public accounting board's degree of "insulation from the President").

[22] *See PHH*, 881 F.3d at 178 (Kavanaugh, J., dissenting); Zywicki, *supra*, at 899; *see also Free Enter. Fund*, 561 U.S. at 505 ("Perhaps the most telling indication of the severe constitutional problem with the [agency] is the lack of historical precedent for this entity."). The D.C. Circuit uncovered only three other similar agencies: the Social Security Administration, Office of Special Counsel, and FHFA, the last of which came into being only in 2008. *See PHH*, 881 F.3d at 174 (Kavanaugh, J., dissenting).

[23] 896 F.3d 640 (5th Cir.) (per curiam), *reinstated in relevant part on reh'g en banc*, 938 F.3d 553 (5th Cir. 2019) (en banc), *petition for cert. filed* (U.S. Sept. 25, 2019) (No. 19-422). The en banc court reinstated the panel's constitutional analysis. *See Collins*, 938 F.3d at 588. So I refer interchangeably to the two decisions as "*Collins*."

tant government-sponsored entities:  the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie"). *Collins*, 938 F.3d at 563.  The FHFA is led by a single Director, serving a five-year term, whom the President can fire only "for cause."  *See* 12 U.S.C. § 4512(a), (b)(2).  Congress does not fund the FHFA with appropriations; instead, the agency assesses charges on the entities it regulates.  *See id.* § 4516(a).  An oversight board advises the agency as it carries out its duties. *See id.* § 4513a(a).

The FHFA wields its fair share of power.  It issues rules, orders, and guidelines to ensure Fannie's and Freddie's "sound operations."[24]  The agency can sue Fannie and Freddie for breaking the law or engaging in unsound practices, can impose penalties, and can order the companies to cease and desist and to remedy violations.[25]

But, most potently, the FHFA can name itself conservator or receiver for Fannie or Freddie if either becomes critically undercapitalized.  *See id.* § 4617. Once so appointed, the FHFA is empowered to conduct all aspects of the companies' business, perform all their functions, preserve or sell their assets, enter into contracts, collect obligations, and so much more.[26]

2.

In assessing the FHFA's structure, the en banc court in *Collins* did not view the agency's various design features in isolation.  Instead, we assessed the "combined effect" of several of them to determine whether they insulated

---

[24] *Collins*, 938 F.3d at 565; *see* 12 U.S.C. §§ 4513, 4526(a).

[25] *Collins*, 938 F.3d at 565; *see* 12 U.S.C. §§ 4631(a)(1), (c), 4632(e), 4635, 4636, 4641.

[26] *Collins*, 938 F.3d at 578; *see generally* 12 U.S.C. § 4617.

the Director too deeply from oversight.[27]  The result?  Twelve of the sixteen judges agreed:  The FHFA cannot withstand constitutional scrutiny.[28]

The first two features were the most significant.  A *solo* Director leads the agency, and she is not removable at will.[29]  We recognized that the removal restriction is not enough, standing alone, to violate the Constitution.  *Collins*, 896 F.3d at 667.  Yet it undoubtedly "dulls an important tool for supervising the FHFA."  *Id.* at 666 (footnote removed).

The single-Director structure is also an insulating innovation.[30]  To date, Congress has given the overwhelming majority of independent agencies multi-membered boards.  *Id.* at 667.  The President can influence those agencies by designating their chairs and removing them at will from that position.  *Id.*  The FHFA is different.  A President can find himself "stuck for years" with a Director selected by a predecessor and opposed to the current administration's policies.  *Id.* at 668.  Because of its solo Director, the FHFA also lacks bipartisan balance, an otherwise standard feature among agencies.  *See id.*  Balanced agencies enable the President to "secure a majority . . . within the first two years of his term."  *Id.*  Not so for the FHFA.

The agency is also insulated from Congress, which, in operation, further

---

[27] *Collins*, 896 F.3d at 666; *see* Eric Pearson, *A Brief Essay on the Constitutionality of the Consumer Financial Protection Bureau*, 47 CREIGHTON L. REV. 99, 118 (2013) ("It is the convergence of these factors rather than any single factor that brings the issue of constitutionality to the fore.  Even if *some* independence from checks and balances is appropriate or even preferable as a matter of policy, the question in this context is whether the simultaneous presence of all of these immunities makes the CFPB too independent.").

[28] *See Collins*, 938 F.3d at 562 (showing eight judges concurring in Judge Willett's majority opinion); *id.* at 591 n.1 (showing three additional judges concurring in the conclusion that the FHFA was structured unconstitutionally).

[29] *See* 12 U.S.C. § 4512(a), (b)(2); *Collins*, 896 F.3d at 666–68.

[30] *See Collins*, 896 F.3d at 667; 12 U.S.C. § 4512(a).

reduces the President's oversight. *See id.* at 668–69. Indeed, because the FHFA does not rely on appropriations, the President loses another tool for overseeing it: namely, his power to veto spending bills related to the agency and to submit annual budgets for Congress's consideration. *Id.*

The final feature is the lack of any robust vehicle for executive-branch oversight. *Id.* at 669. Though the Federal Housing Finance Oversight Board advises the Director, 12 U.S.C. § 4513a(a), the Board can't "*require* the FHFA or Director to do anything," *Collins*, 896 F.3d at 669. Thus, the merging of several features—solo Director, removal protections, partisanship, abnormal funding, and lack of supervision—results in an agency too sequestered for the Constitution to bear. *Id.* at 674.

## III. *COLLINS (EN BANC)* CONTROLS

The CFPB and FHFA are sister institutions. Only a judge who plays "semantic games of reformulation and hair splitting in order to escape the force of a fairly resolved issue" can conclude, as a matter of constitutional law, that the agencies are sufficiently different.[31] Quite the contrary. The only material distinctions magnify—not reduce—the extent of the CFPB's infirmity.

### A. *Same Structure*

First, consider the agencies' twin structures. Both are captained by a lone Director, with a resulting lack of bipartisan balance.[32] Each Director serves a five-year term and has removal protections for her duration in office.[33]

---

[31] *Bhandari v. First Nat. Bank of Commerce*, 829 F.2d 1343, 1352 (5th Cir. 1987) (en banc) (Higginbotham, J., concurring), *cert. granted, judgment vacated*, 492 U.S. 901 (1989), *and opinion reinstated*, 887 F.2d 609 (5th Cir. 1989) (per curiam).

[32] *See* 12 U.S.C. §§ 4512(a), 5491(b)(1).

[33] *See id.* § 5491(c)(1), (3) (CFPB); *id.* § 4512(b)(2) (FHFA).

No. 18-60302

And each agency is funded outside congressional appropriations.[34] The Bureau thus enjoys the identical structural insulation that we held unlawful in *Collins*. The glove fits.

## B. *More Power*

The CFPB's structure mirrors the FHFA, but the breadth of its power is far greater. That is important, because the scope of the CFPB's authority is a crucial variable in the constitutional equation.[35] We must analyze the degree to which a removal restriction interferes with the President's obligation to execute the law. *Morrison*, 487 U.S. at 691–92. That necessarily invokes an inquiry into the agency's powers, because what an independent officer receives, the President loses.[36]

The interference with the President's duties is widespread and punish-

---

[34] *See id.* §§ 4516(a), 5497. It's true that if the CFPB needs more money than the Fed's budget can handle, it must seek extra rations from Congress, *see id.* § 5497(e), and that the FHFA's statute had no similar provision, *see id.* § 4516. But that difference is insignificant, given the Fed's hefty budget. Indeed, in recent years, the CFPB has needed much less funding than that to which it was entitled. *See* CFPB, *Fiscal Year 2019: Annual Performance Plan and Report, and Budget Overview* 7 (Feb. 2019), https://perma.cc/RLH2-HTHH. And the CFPB only needs to seek any extra funds from Congress, not the whole lot. *See* 12 U.S.C. § 5497(e)(1).

[35] *See, e.g.*, *Morrison*, 487 U.S. at 691 (emphasizing, in upholding removal restriction, the independent counsel's "limited jurisdiction and tenure" and lack of "significant administrative authority"). My focus on the scope of the agency's power does not ignore the tradition of independence for financial regulators, a theme amply reviewed in *PHH*, 881 F.3d at 91–92, 102. That such independence is traditional does not mean it passes muster in every case. Indeed, the Public Company Accounting Oversight Board was a financial regulator, yet the Court found its removal protections unconstitutional. *See Free Enter. Fund*, 561 U.S. at 508. Congress has scarcely given as much power to an independent financial regulator as it has to the CFPB, let alone housed all of that power in one individual. That triggers the central constitutional question.

[36] *See* 12 U.S.C. § 5512(b)(4)(A) (granting the CFPB nearly *exclusive* authority to issue rules under the laws it administers); *see also PHH*, 881 F.3d at 172 (Kavanaugh, J., dissenting) (pointing out that, within her jurisdiction, the CFPB Director has more power than does the President).

ing. It dominates anything Congress did in creating the FHFA, which is saying something. Indeed, the FHFA's ability to take over Fannie and Freddie is a considerable source of authority, and the agency wields multiple governmental powers. But the FHFA's jurisdiction still pales. That agency supervises two entities; the CFPB regulates a major chunk of American commerce.[37] Congress handed the Director the keys to *eighteen* consumer-protection laws, including such landmark statutes as the Truth in Lending Act, the Fair Debt Collection Practices Act, and the Fair Credit Reporting Act. *See* 12 U.S.C. § 5481(12). Her powers touch banking, home finance, credit cards, and consumer loans. *See id.* She "is the regulator of first resort and the primary law enforcement authority for a vital sector of our economy." *Free Enter. Fund*, 561 U.S. at 508.

And the Director can exercise those powers unilaterally, because she alone is at the helm. Indeed, the Director's solitary status not only contributes to her insulation; it also magnifies her powers.

There is a reason, after all, that our Founders vested the executive power in *one* President. *See* U.S. CONST. art. II, § 1, cl. 1. They recognized that a single magistrate could act with greater energy, speed, and effectiveness in carrying out his duties.[38] "The first thing which strikes our attention is, that the executive authority, with few exceptions, is to be vested in a single magistrate."[39] "Decision, activity, secrecy, and d[i]spatch, will generally characterize

---

[37] *See* Zywicki, *supra*, at 874 ("[T]he CFPB director performs an enormous policy-making function by controlling the flow and terms of consumer credit in the American economy.").

[38] *See, e.g.*, THE FEDERALIST NO. 70, at 363 (Hamilton) (Liberty Fund ed. 2001) ("That unity is conducive to energy, will not be disputed."); GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC: 1776–1787, at 430–33 (1998) (describing the Founding generation's growing conviction, during the years leading up to the adoption of the federal Constitution, that legislative abuses needed to be curbed in part by strengthening and unifying the executive power).

[39] THE FEDERALIST NO. 69, at 355. Although today we use the word "magistrate" to

the proceedings of one man, in a much more eminent degree than the proceedings of any greater number; and in proportion as the number is increased, these qualities will be diminished."[40]  "Those politicians and statesmen who have been the most celebrated for the soundness of their principles, and for the justness of their views, have declared in favour of a single executive . . . ."[41] "[A]ttaching ourselves purely to the dictates of reason and good sense, we shall discover much greater cause to reject, than to approve, the idea of plurality in the executive . . . ."[42]

The same logic demonstrates that the Director's solo status increases her powers and therefore also interferes more with the President's. "Wherever two or more persons are engaged in any common enterpri[s]e or pursuit, there is always danger of difference of opinion."[43]  The Director faces no such danger. Unencumbered by the need to cobble together a majority, the Director acts with greater speed and scope.[44]  The result is more for her to do and less for the President.  Unitary power is more explosive than power diffused.[45]

---

refer to a judge, the Founders assigned that term, as well, to executive officers.  *See, e.g.,* THE FEDERALIST NO. 48, at 257 (Madison) (referring to "executive magistrates" and "the executive magistracy" and "an hereditary magistrate" when discussing the role of the President under Article II).

[40] THE FEDERALIST NO. 70, at 363; *see Myers*, 272 U.S. at 116 ("The debates in the Constitutional Convention indicated an intention to create a strong Executive, and after a controversial discussion the executive power of the Government was vested in one person[.]").

[41] THE FEDERALIST NO. 70, at 363.

[42] *Id.* at 364.

[43] *Id.*

[44] *See PHH*, 881 F.3d at 184 (Kavanaugh, J., dissenting) ("A multi-member independent agency can go only as far as the middle vote is willing to go."); Zywicki, *supra*, at 878 (observing that the CFPB's single-Director structure eliminates "collegial decisionmaking," resulting in "tunnel vision").

[45] Alexander Hamilton believed as much.  *See* THE FEDERALIST NO. 70 (Hamilton), at 366 (arguing against an executive council and in favor of a single magistrate, because "the mere diversity of views and opinions" in the former "would alone be sufficient to tincture the exercise of the executive authority with a spirit of habitual feebleness and dilatoriness").

No. 18-60302

In exercising unilateral authority, very little constrains the Director. As one example, she has the ability—subject only to narrow limits in 12 U.S.C. § 5531(c) and (d)—to prohibit any practice in consumer finance that she deems "unfair, deceptive, or abusive." *Id.* § 5531(b). The Director already has jurisdiction over eighteen statutes designed to protect against various forms of abuse and deception. *See id.* § 5481(12). But, in section 5531, her authorities extend yet further. Even casual observers of human nature will note its genius in plotting creative ways to deceive. Consumer finance is no exception. The CFPB's powers extend as far as the imagination will take them.

## C. *Inconsequential Differences*

The only relevant structural difference between the agencies—the FSOC—is overtly pedestrian. Undeterred, the majority stubbornly asserts that the FSOC's presence somehow makes the CFPB accountable. Not so.

The FSOC's primary authority consists in its narrowly circumscribed ability to veto the CFPB's rulemakings. *See id.* § 5513(a). The Council's ten voting members include the Secretary of the Treasury, the Comptroller of the Currency, a member appointed by the President, and the chairs of seven independent agencies, including the CFPB itself and the FHFA. *Id.* § 5321(b)(1). The President appoints each of those to his or her respective office.[46] They may exercise the veto only by a supermajority vote and only where the rule threatens "the stability of the financial system of the United States." *Id.* § 5513(c)(3)(A), (B)(ii).

The majority accurately notes that *Collins* relied on the FSOC in pointing out differences between the FHFA and the CFPB.[47] That, the majority

---

[46] *See PHH*, 881 F.3d at 120 n.3 (Wilkins, J., concurring).

[47] *See Collins*, 896 F.3d at 669–70, 672–74.

brags, shows that *Collins* could not possibly control. But it is hard to think of a better example of *dictum*, defined as that which "could have been deleted without seriously impairing the analytical foundations of the holding,"[48] than the en banc court's discussion of the CFPB. The Bureau's constitutionality was not before it.

"We are not bound by dicta, even of our own court." *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980). Distinguishing the CFPB was plainly not a pillar upon which *Collins* stood or fell, but only an observation by some judges to show that they were focusing on the particulars of the agency at issue. To suggest—rightly or wrongly—that one agency may be less constitutionally infirm than another is not to say that one is sick and the other is well.

Today's majority thus tiptoes around *Collins*'s holding but drives a truck through its *dictum*. That is how you turn an "analysis on its head." *Wood v. Collier*, 836 F.3d 534, 541 (5th Cir. 2016) (Higginbotham, J.).

The FSOC cannot save the CFPB from its hour of trouble, no matter how badly the majority wishes it were so. It is hard to imagine an oversight council with less capacity to oversee.

To start, the FSOC can set aside only the Director's *rulemakings* and has no authority over the agency's enforcement actions or adjudications.[49] That matters. It is a foundational principle of administrative law that agencies can forgo rulemaking and instead make substantive policy by adjudicating and

---

[48] *Netsphere, Inc. v. Baron*, 799 F.3d 327, 333 (5th Cir. 2015) (Higginbotham, J.) (quoting *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014)).

[49] *See* 12 U.S.C. § 5513(a); *see also PHH*, 881 F.3d at 159 (Henderson, J., dissenting) ("As far as the Council is concerned, then, the CFPB can break the law or abuse its power as long as it does so (1) in an enforcement action or (2) in a regulation that does not threaten national financial ruin.").

bringing enforcement actions.[50]  Some do almost all of their policymaking via those means,[51] and the CFPB has taken advantage of its *Chenery II* prerogatives.[52]  The FSOC can do nothing about any of it.  Its lack of authority over adjudications and enforcement leaves a gaping hole in its supposed oversight of the CFPB's policymaking.

And even within the rulemaking category, the Council must defeat significant procedural and substantive hurdles.  The main procedural one is the

---

[50] *See SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."); *see also* Kevin M. Stack, *The Constitutional Foundations of* Chenery, 116 YALE L.J. 952, 1000 (2007) ("[It is] well-established doctrine (established, indeed, by *Chenery II*) that an agency generally has broad discretion to choose how to implement a statutory grant of power, whether through rulemaking or through adjudication."); Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 ALA. L. REV. 1205, 1250 (2014) ("Often a statute will leave an agency with discretion about whether to proceed through rulemaking or adjudication and the Court has held that such discretion rests with the agency.").

[51] The NLRB is the most notorious example.  *See, e.g.*, Charlotte Garden, *Toward Politically Stable NLRB Lawmaking: Rulemaking vs. Adjudication*, 64 EMORY L.J. 1469, 1471 (2015) ("For decades now, academics and courts have been calling on the [NLRB] . . . to use its rulemaking authority, rather than relying nearly exclusively on announcing legal principles through adjudication.").

[52] Indeed, the CFPB has taken heat for engaging in "regulation by enforcement" instead of issuing rules.  Recall that its power to prohibit consumer-finance practices that are "abusive" is new in consumer protection.  *See* Zywicki, *supra*, at 918.  Title X provides some color as to what "abusive" means, *see* 12 U.S.C. § 5531(d), but many have called for a rulemaking to provide more detail, *see, e.g.*, Daniel Press, *Consumer Financial Protection Bureau Should Define 'Abusive'*, COMPETITIVE ENTER. INST. (June 5, 2019), https://perma.cc/6T8U-S8RV.

The clamor was loud enough that Acting Director Mick Mulvaney testified that the Bureau would cease its practice of "regulation by enforcement."  He explained that "people will know what the rules are before the Bureau accuses them of breaking those rules."  *The Consumer Financial Protection Bureau's Semi-Annual Report to Congress: Hearing Before the Comm. on Banking, Hous., and Urban Affairs, U.S. Senate*, 115th Cong. 46 (April 12, 2018) (statement of Mick Mulvaney, Acting Director), *available at* https://perma.cc/V6UT-3FYS.  The Bureau provided those seeking clarity a half victory, as it issued a policy statement that purports to "provide[] a framework for the Bureau's exercise of its supervisory and enforcement authority to address abusive acts or practices."  *See Statement of Policy Regarding Prohibition on Abusive Acts or Practices*, CFPB (Jan. 24, 2020), *available at* https://perma.cc/JXA5-ALTE.

requirement of a supermajority vote.  12 U.S.C. § 5513(c)(3)(A).  One of the voting members is the Director, and presumably she is unlikely to cast a ballot wiping away a rule that she has just promulgated.  *Id.* § 5321(b)(1)(D).  In practical effect, then, a veto happens only if seven of nine are interested.

The FSOC also cannot eliminate whatever rule it wishes.  Instead, it can step in only where the new law would endanger "the safety and soundness" of the *entire* national financial system.  *Id.* § 5513(a).  Such an "extreme test will rarely be satisfied in practice,"[53] and if the Council misapplies it, judicial review is available.[54]  In sum, the FSOC's veto can override only one of the CFPB's three governmental functions (rulemaking), and, within that category, its power is procedurally and substantively restrained.

There's more.  If, as the majority claims, the FSOC's presence makes the CFPB lawful when the FHFA was infirm, then it must be that the President can oversee the Council.  But the President's capacity to do so is predictably scant.

For one, not every President will get to appoint each of its voting members, because some have terms longer than four years.  *See PHH*, 881 F.3d at 120 n.3 (Wilkins, J., concurring).  And if the President disagrees with the FSOC's exercise of discretion, he faces a difficult choice.  If he wants to fire one of its members, such will also require removing the member from his main executive office, since nine of the ten members sit on the FSOC *ex officio*.  12 U.S.C. § 5321(b)(1).

---

[53] Zywicki, *supra*, at 875; *but see* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEX. L. REV. 15, 75 (2010) (contending that "the threat of veto" is "a real one").

[54] *See* 12 U.S.C. § 5513(c)(8) ("A decision by the Council to set aside a regulation prescribed by the Bureau . . . shall be subject to review under [the Administrative Procedure Act].").

No. 18-60302

If, for example, the President is frustrated enough with the Chairman of the SEC's performance on the FSOC to want to dismiss him, the President must banish him from his perch atop the Commission to do so.[55]  That is a significant disincentive to removal.  So, the FSOC's oversight is narrowly cabined, and the President's oversight of the overseer is itself narrowly constrained.  The Council gives the President very little control.

In the final analysis, that Congress felt a need to create the FSOC reveals what is ultimately the Bureau's root problem: its vast, unaccountable authority.[56]  Congress apparently worried that it had "created a monster by handing an agency breathtakingly broad powers and insulating the[ir] exercise." *Saxton v. FHFA*, 901 F.3d 954, 963 (8th Cir. 2018) (Stras, J., concurring).  The FSOC was Congress's measured response: a body that can step in, but only when the stability of the entire economy hangs in the balance.  The Council's authority sweeps no further.

\* \* \* \* \*

In *Collins*, the en banc court confronted a powerful agency that merged several insulating features, including a single Director, removal protection, and abnormal funding.  Those features, we held, combined to violate the separation of powers.  Twelve of sixteen agreed.

This three-judge panel now faces a *much more* powerful agency assembled in the very same way.  Yet the two-judge majority holds the very opposite,

---

[55] *See id.* § 5321(b)(1)(E) (establishing that the Chairman of the SEC shall serve as a voting member on the FSOC).

[56] *See PHH*, 881 F.3d at 160 (Henderson, J., dissenting) ("The fact that anyone mentions the Council's narrow veto as a check is instead a testament to the CFPB's unaccountable policymaking power.").

35

relying, as it must, on distinctions without a difference. So much for "the role of settled judicial rules."[57] The "patent refusal to apply well-established law in a neutral way is indefensible."[58]

The judges in today's majority desperately search for anything—*anything at all*—that might excuse the obligation to apply the law. By counting to two, they succeed. *Collins* does not deserve the death sentence it now receives. I respectfully dissent.

---

[57] *June Med. Servs.*, 905 F.3d at 816 (Higginbotham, J., dissenting).

[58] *June Med. Servs.*, 913 F.3d at 585 (Higginson, J., dissenting from the denial of rehearing en banc) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2331 (2016) (Alito, J., dissenting), *as revised* (June 27, 2016)).